ESTATE OF JAMES H. GRAY, SR., DECEASED, TERRY P. MCKENNA, EXECUTOR, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Gray v. Commissioner
Docket No. 2736-91
United States Tax Court
T.C. Memo 1993-334; 1993 Tax Ct. Memo LEXIS 339; 66 T.C.M. (CCH) 254; July 29, 1993, Filed *339 Decision will be entered under Rule 155. For petitioner: Robert H. Hishon. For respondent: Clinton M. Fried. WELLS
WELLS
MEMORANDUM FINDINGS OF FACT AND OPINION WELLS, Judge: Respondent determined a deficiency in petitioner's Federal estate tax in the amount of $ 8,545,900. After concessions, the issue to be decided is the fair market value, as of September 19, 1986, of decedent's controlling interest in Gray Communications Systems, Inc. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect at the date of decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT Some of the facts and certain documents have been stipulated for trial pursuant to Rule 91 and are found accordingly. We incorporate by reference the parties' stipulations. Petitioner is the Estate of James H. Gray, Sr., Terry P. McKenna, Executor. Terry P. McKenna is the duly appointed executor of the Estate of James H. Gray, Sr. The parties stipulated that, at the time the petition was filed, petitioner's legal address was in Albany, Georgia. On September 19, 1986, James H. Gray, Sr. (decedent), a resident of Albany, *340 Georgia, died. Decedent was survived by his spouse and three children. At the time of his death, decedent owned 253,800 shares (decedent's shares) of common stock of Gray Communications Systems, Inc. (Gray Comm), a publicly held Georgia corporation whose principal offices are located in Albany, Georgia. Decedent's shares represented a 50.487 percent majority stock interest in Gray Comm. During 1986, Gray Comm's issued and outstanding shares consisted of a single class of common stock. The company had a total of 502,700 shares outstanding. Prior to his death, decedent had been Gray Comm's president and the chairman of its board of directors. Subsequent to decedent's death, Mr. McKenna (the executor of decedent's estate) became the company's president. Gray Comm was originally incorporated on January 25, 1897, as The Herald Publishing Company. On June 15, 1967, the corporation's name was changed to Gray Comm. Gray Comm's shares are traded on the over-the-counter market. During 1986, however, public trading in the shares was thin. All of decedent's shares were subject to restriction under Rule 144 of the Securities and Exchange Commission (SEC). For many years, Gray Comm *341 had been a holding company. At decedent's death, Gray Comm engaged in newspaper publishing, television broadcasting, transportation services, video systems sales, and real estate development, through its wholly owned subsidiaries. Albany Herald
Gray Comm's newspaper publishing business is owned and operated through its subsidiary, The Albany Herald Publishing Co., Inc. (Albany Herald), located in Albany, Georgia. The city of Albany is located in southern Georgia, approximately 125 miles south of Atlanta. During 1986, the city's population was approximately 70,000. The Albany Herald's evening circulation was the second largest of any newspaper in Georgia. Revenue was derived from daily newspaper publication. The newspaper's area of circulation was concentrated in a 26-county area in southern Georgia and northern Florida. As of September 30, 1986, the Albany Herald's daily circulation was 37,937. Gray Comm and its subsidiaries' consolidated financial statements for their fiscal years 1984, 1985, and 1986 reflect that newspaper publishing revenues were generated, and publishing and circulation expenses were incurred, as follows: FYE 6/30/84
FYE 6/30/85
FYE 6/30/86
Newspaper publishing
$ 7,733,185
$ 8,446,046
$ 8,704,642
revenues Publishing and
3,489,919
3,915,276
4,092,429
circulation expenses *342 Television Stations
Gray Comm's television broadcasting business was conducted through its three wholly owned, television station subsidiaries. Each subsidiary operated a television station broadcasting on an NBC network-affiliated VHF band. The three television stations were: (1) WALB-TV, Channel 10, Albany, Georgia; (2) WJHG-TV, Channel 7, Panama City, Florida; and (3) KTVE-TV, Channel 10, Monroe, Louisiana, and El Dorado, Arkansas. As noted in Gray Comm's 1986 annual report to its shareholders, the company's television stations are "recognized as among the best of their size in the nation". The Albany, Georgia, station, WALB-TV, was the dominant station in a 20-county area. The Panama City, Florida, station, WJHG-TV, was the leading NBC affiliate in four counties in Alabama, Florida, and Georgia, and had a number one market share in the Florida counties Bay, Calhoun, Franklin, Gulf, Walton, and Washington. Panama City is located on the Gulf Coast in Bay County in northwest Florida, approximately 100 miles southwest of Tallahassee. During 1986, Panama City's estimated population was 125,391. The Louisiana/Arkansas station, KTVE-TV, ranked second in its market area *343 and planned to erect a new antenna to expand its broadcasting capabilities. During 1986, the areas of Monroe, Louisiana, and El Dorado, Arkansas, were economically depressed as a result of the slump in the oil industry on which the region depended. Monroe, Louisiana, is located in Ouachita Parish in northeastern Louisiana, near the Arkansas border. During 1986, the city's estimated population exceeded 139,000. El Dorado, Arkansas, is located in Union County in southern Arkansas, very near the Louisiana border. El Dorado is approximately 95 miles northeast of Shreveport, Louisiana, and is approximately 125 miles south of Little Rock, Arkansas. During 1986, El Dorado's estimated population was 22,000. The estimated size of the three television stations' area of dominant influence and their estimated operating results during Gray Comm's fiscal year ended June 30, 1986, is summarized as follows: Area of
Market's
Station's
Dominant
Total
Revenue
Station
Operating
Influence
Revenue
Share
Revenue
Cash Flow
Margin
Station
(sq. mi.)
(mil.)
(%)
(mil.)
(mil.)
(%)
WALB-TV
150
$ 19.9
33
$ 6.663
$ 3.548
53
WJHG-TV
175
5.5
62
3.393
1.081
32
KTVE-TV
114
12.0
29
3.458
.598
17
*344 Transportation Services
Gray Comm's subsidiary, Gray Transportation Co., Inc., leased autos, sold and serviced aircraft, chartered aircraft, sold aviation and bulk fuel, leased warehouse space, and operated a retail tire store. It leased 10 acres from the City of Albany and Dougherty County at the county airport which includes offices and hangar space of 20,000 square feet, owned 8.9 acres in an industrial tract in Albany, Georgia, having warehouse space of 125,000 square feet, and owned 20.3 acres in Ashburn, Georgia. Video Systems Sales
Gray Comm's subsidiary, Gray Communications Consultants, Inc., sold and distributed video systems and equipment. The subsidiary sold brand name video equipment under various licensing agreements that permitted the marketing of a particular manufacturer's merchandise in a limited geographical area. The term of the licenses generally was one year. During 1986, aside from the office and warehouse space it owned in Albany, Georgia, the subsidiary leased space in Atlanta, Birmingham, Gainesville, Little Rock, Miami, Mobile, Nashville, New Orleans, Orlando, and Tampa. Real Estate Development
Gray Comm's real estate development *345 subsidiary, Gray Real Estate & Development Co., was formed during 1986 to develop and manage real estate operations, which included 6 acres of land located in downtown Albany, Georgia, that was held for future commercial development, and 1,103 acres of undeveloped land located approximately 2.5 miles outside of Albany, Georgia. During 1986, Gray Comm expended $ 321,775.14 for development of its real estate holdings. The 6 acres of land located in downtown Albany had been purchased for $ 2,844,958 by Gray Comm during its fiscal year 1986. Originally, Gray Comm and one of its directors had each owned one-half undivided interests in the other 1,103 acres of land. During its 1985 fiscal year, Gray Comm purchased the director's half interest in the land for $ 650,000. On November 19, 1986, Gray Comm's board of directors decided to accept an offer to sell the 1,103 acres of land for a cash price of $ 1.5 million. Federal Communications Commission's Cross-Ownership Rule
Since 1954, Gray Comm had owned the Albany Herald newspaper and the Albany television station, WALB-TV. During 1978, the Federal Communications Commission (FCC) amended its multiple ownership rules to prohibit *346 the formation of co-located newspaper-broadcast combinations. Gray Comm's pre-existing ownership of the Albany newspaper and Albany television station was grandfathered from the application of the FCC rule. Any transfer of control in Gray Comm, however, except for transfers to heirs or legatees, would trigger application of the FCC rule. In the event of a transfer of control in Gray Comm that was subject to the FCC rule, Gray Comm would be required to divest itself of either the Albany newspaper or the Albany television station. Gray Comm's Financial History
During each of its fiscal years ended June 30, 1982, through June 30, 1986, Gray Comm paid annual dividends to its shareholders of $ .375 per share. Gray Comm's 1986 annual report to its shareholders made the following statements concerning the company's liquidity and capital resources: The Company's working capital at June 30, 1986, 1985, and 1984 was approximately $ 7,479,000, $ 10,365,000, and $ 8,120,000, respectively. For the years ended June 30, 1986, 1985, and 1984, the Company's working capital decreased approximately $ 2,886,000 and increased approximately $ 2,245,000, and $ 160,000, respectively. The *347 Company has had no new long-term borrowings in the last three years. It has been the Company's policy to fund its capital expenditures and acquisitions out of earnings from operations. This policy of growth and expansion from internal means will likely continue, although the Company's financial position is strong if borrowings are necessary. At June 30, 1986, 1985 and 1984, the Company's debt to equity ratio was approximately .01 to 1. At June 30, 1986, the Company has approximately a $ 5,000,000 capital expenditure requirement during the next year. These expenditures are expected to be funded out of the Company's normal operations and by bank lines of credit which provide for an aggregate short-term borrowings of $ 5,000,000.
At the time of decedent's death on September 19, 1986, Gray Comm's management had no plan to liquidate the corporation or its businesses. Petitioner made no effort to sell its 50.487 percent stock interest in Gray Comm during the first 12 months following decedent's death. As indicated above, Gray Comm's shares were publicly traded on the over-the-counter market. As of June 30, 1986, the company's records reflected that there were about 245 holders *348 of Gray Comm's shares. On September 18, 1986, the day prior to decedent's death, Gray Comm's shares were quoted at a $ 138 per share bid, $ 152 per share asked, on the over-the-counter market. On the September 19, 1986, date of decedent's death, Gray Comm's shares were quoted at a $ 160 per share bid, $ 177 per share asked, with an actual trading volume of 1,100 shares. On September 22, 1986, the first trading date following decedent's death, Gray Comm's shares were quoted at a $ 165 per share bid, $ 195 per share asked. [1]
*349 During the period from July 1, 1986, through December 31, 1986, the quoted bid and asked prices and the trading volume in Gray Comm's shares on the over-the-counter market were as follows: Bid Price
Asked Price
Trading Volume Date (per share)
(per share)
(number of shares)
7/1/86
$ 143
$ 155
700
7/2/86
143
155
1,300
7/3/86
143
157
-- 7/7/86
143
157
600
7/8/86
143
157
400
7/9/86
143
157
-- 7/10/86
143
157
-- 7/11/86
143
157
-- 7/14/86
143
157
-- 7/15/86
143
157
500
7/16/86
143
155
300
7/17/86
142
155
-- 7/18/86
142
155
-- 7/21/86
142
155
-- 7/22/86
143
155
-- 7/23/86
143
155
-- 7/24/86
143
155
-- 7/25/86
143
155
300
7/28/86
143
155
-- 7/29/86
143
154
-- 7/30/86
143
154
-- 7/31/86
143
154
200
8/1/86
143
154
-- 8/4/86
143
154
-- 8/5/86
143
154
-- 8/6/86
143
154
-- 8/7/86
143
154
-- 8/8/86
143
154
-- 8/11/86
143
154
-- 8/12/86
143
154
-- 8/13/86
143
154
-- 8/14/86
143
154
-- 8/15/86
143
154
-- 8/18/86
143
154
-- 8/19/86
143
154
-- 8/20/86
143
154
-- 8/21/86
143
154
-- 8/22/86
143
154
-- 8/25/86
143
154
-- 8/26/86
143
154
-- 8/27/86
143
154
-- 8/28/86
143
154
-- 8/29/86
143
154
-- 9/2/86
143
154
-- 9/3/86
143
154
-- 9/4/86
143
154
-- 9/5/86
143
154
-- 9/8/86
143
154
-- 9/9/86
143
154
-- 9/10/86
143
154
-- 9/11/86
142
153
1,000
9/12/86
142
153
-- 9/15/86
138
152
-- 9/16/86
138
151
100
9/17/86
138
152
-- 9/18/86
138
152
-- 9/19/86
160
177
1,100
9/22/86
165
195
-- 9/23/86
170
200
-- 9/24/86
177
205
1,000
9/25/86
177
205
-- 9/26/86
177
205
900
9/29/86
177
205
400
9/30/86
177
205
-- 10/1/86
177
205
1,000
10/2/86
177
205
5,000
10/3/86
177
205
-- 10/6/86
177
205
100
10/7/86
178
200
1,100
10/8/86
178
200
-- 10/9/86
179
196
-- 10/10/86
179
196
-- 10/13/86
179
196
-- 10/14/86
179
196
-- 10/15/86
179
206
300
10/16/86
179
206
300
10/17/86
179
205
-- 10/20/86
179
202
-- 10/21/86
179
202
-- 10/22/86
179
202
-- 10/23/86
179
202
-- 10/24/86
179
202
100
10/27/86
180
200
-- 10/28/86
180
200
100
10/29/86
180
200
1,600
10/30/86
180
200
-- 10/31/86
180
200
800
11/3/86
180
198
1,000
11/4/86
180
197
100
11/5/86
180
198
900
11/6/86
183
201
1,200
11/7/86
190
209
800
11/10/86
190
209
300
11/11/86
190
209
--
11/12/86
190
209
100
11/13/86
191
208
100
11/14/86
191
208
1,000
11/17/86
191
208
800
11/18/86
191
208
--
11/19/86
191
208
--
11/20/86
191
208
--
11/21/86
194
208
100
11/24/86
194
209
100
11/25/86
194
209
--
11/26/86
197
209
100
11/28/86
197
209
400
12/1/86
197
209
1,600
12/2/86
197
209
--
12/3/86
199
209
1,500
12/4/86
199
* 211
100
12/5/86
199
211
100
12/8/86
199
211
--
12/9/86
199
211
1,100
12/10/86
199
211
100
12/11/86
199
211
200
12/12/86
199
211
--
12/15/86
199
211
100
12/16/86
199
211
100
12/17/86
199
211
700
12/18/86
199
211
600
12/19/86
199
211
400
12/22/86
199
210
2,600
12/23/86
199
210
600
12/24/86
199
210
300
12/26/86
199
210
500
12/29/86
199
210
700
12/30/86
199
210
1,300
12/31/86
199
210
500
*350 Subsequent Litigation by Decedent's Spouse
In his last will, decedent left to his spouse his Albany, Georgia, residence and certain household furnishings and personal effects, and directed that during her life, she would receive the first $ 20,000 of net annual income from the testamentary trust holding the remainder of decedent's estate. On June 1, 1987, decedent's surviving spouse commenced a lawsuit in Georgia State court to enforce an alleged oral promise by decedent to leave her one-third of his Gray Comm shares in exchange for her promise not to seek a divorce from him. Petitioner defended the lawsuit and counterclaimed for a construction of decedent's will. Decedent's children and representatives of decedent's grandchildren intervened and joined in the lawsuit. Pursuant to a settlement of the claims asserted by decedent's surviving spouse, petitioner, with the approval of the other beneficiaries under the will (decedent's children and decedent's grandchildren): *351 (1) On March 11, 1988, paid decedent's surviving spouse and her attorneys $ 750,000 cash; (2) on March 11, 1988, paid decedent's surviving spouse and her attorneys $ 10,000 cash; (3) on March 11, 1988, purchased a commercial annuity contract from an insurance company payable to decedent's surviving spouse in the amount of $ 10,000 a month, beginning April 1988, and terminating on the earlier of her death or 20 years; (4) on April 7, 1988, paid decedent's surviving spouse $ 10,000 cash; (5) on April 15, 1988, delivered to decedent's surviving spouse certain household furnishings and personal effects of decedent which were valued at $ 114,937; (6) on April 15, 1988, delivered to decedent's surviving spouse title to decedent's residence in Albany, Georgia, having a value of $ 200,000; and (7) on October 14, 1988, purchased and delivered to decedent's surviving spouse title to certain improved real estate in Panama City, Florida, and related furnishings, having a value of $ 90,337.23. Estate Tax Return and Notice of Deficiency
Petitioner timely filed its estate tax return. On the estate tax return, petitioner valued decedent's shares, as of the date of decedent's death, September *352 19, 1986, at $ 35,532,000 or $ 140 per share. Petitioner subsequently filed first and second amended estate tax returns. On the amended returns, petitioner made no change in its valuation of decedent's shares. On December 4, 1990, respondent mailed the notice of deficiency to petitioner's last known address. In the notice of deficiency, respondent determined that the fair market value of decedent's shares was $ 50,760,000 or $ 200 per share. OPINION Property is generally included in the gross estate at its fair market value on the date of the decedent's death, or on the alternate valuation date, if applicable. Sec. 2031(a); sec. 20.2031-1(b), Estate Tax Regs. "Fair market value" is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts. ; sec. 20.2031-1(b), Estate Tax Regs. In general, the value of stock is the fair market value per share on the applicable valuation date. Sec. 20.2031-2(a), Estate Tax Regs. Section 20.2031-2(b)(1), Estate *353 Tax Regs, provides, in pertinent part, that: In general, if there is a market for stocks * * *, on a stock exchange, in an over-the-counter market, or otherwise, the mean between the highest and lowest quoted selling prices on the valuation date is the fair market value per share * * *. If there were no sales on the valuation date but there were sales on dates within a reasonable period both before and after the valuation date, the fair market value is determined by taking a weighted average of the means between the highest and lowest sales on the nearest date before and the nearest date after the valuation date. The average is to be weighted inversely by the respective numbers of trading days between the selling dates and the valuation date. * * *
In the event that the stock's selling price does not reflect fair market value, however, "some reasonable modification of that basis or other relevant facts and elements of value are considered in determining fair market value". Sec. 20.2031-2(e), Estate Tax Regs. Section 20.2031-2(e), Estate Tax Regs., lists the following examples of such instances: Where sales at or near the date of death are few or of a sporadic nature, *354 such sales alone may not indicate fair market value. In certain exceptional cases, the size of the block of stock to be valued in relation to the number of shares changing hands in sales may be relevant in determining whether selling prices reflect the fair market value of the block of stock to be valued. If the executor can show that the block of stock to be valued is so large in relation to the actual sales on the existing market that it could not be liquidated in a reasonable time without depressing the market, the price at which the block could be sold as such outside the usual market, as through an underwriter, may be a more accurate indication of value than market quotations. * * * On the other hand, if the block of stock to be valued represents a controlling interest, either actual or effective, in a going business, the price at which other lots change hands may have little relation to its true value.
See generally . The determination of the fair market value of stock is a question of fact. , *355 affg. . Selection of the proper market for valuation purposes is also a question of fact. , affg. . At trial, three expert witnesses testified. We weigh their testimony in light of the respective expert's qualifications as well as all other credible evidence. , affg. ; . As the trier of fact, however, we are not bound by the opinion of any expert witness and will accept or reject expert testimony in the exercise of sound judgment. ; ; . We can pick and choose among the expert witnesses' opinions based on the other credible *356 evidence of record. . Consequently, we will consider expert opinion to the extent that it assists us in resolving the issues presented by the instant case. Petitioner's Expert
In preparing its estate tax return, petitioner retained Willamette Management Associates, Inc. (Willamette), to appraise the 253,800 Gray Comm shares. In its appraisal report, Willamette concluded that the fair market value of decedent's shares, as of September 19, 1986, was $ 140 per share. At trial, Donna Walker, who authored the Willamette report, testified regarding the appraisal Willamette performed. Willamette valued the shares taking into account the value that could be realized if the 253,800 shares were marketed under the following three approaches: (1) Sales in small lots over an extended period of time in compliance with Rule 144 of the SEC; (2) a public offering; and (3) a private offering to a third party. Willamette stated that, absent registration, the SEC's Rule 144 would restrict sale of the 253,800 shares on a public market *357 or on a listed exchange. For any 3-month period, SEC Rule 144 would limit the amount of shares that could be sold to the greater of: (1) One percent of the total number of shares in Gray Comm that were outstanding or (2) the average weekly reported public trading volume in Gray Comm shares during the 4 calendar weeks preceding the filing of the required notice of sale. Willamette concluded that it would take 12.6 years to sell decedent's shares under SEC Rule 144. Willamette further determined that without the restriction imposed by SEC Rule 144, decedent's shares would have a publicly-traded value of about $ 145 per share, which represented the average of the quoted bid and asked prices for Gray Comm shares on the over-the-counter market, as of September 18, 1986, the day before decedent's death. Willamette applied a 35 percent discount to the $ 145 per share value to take into account that decedent's shares would have to be sold in small lots over 12.6 years to comply with SEC Rule 144, and concluded that decedent's shares would have a value of $ 94.25 per share. Willamette believed that the owner of decedent's shares could also have Gray Comm register the shares with the SEC *358 so that the entire block could be offered for sale to the public in a secondary offering. Willamette selected $ 145 per share as an appropriate public offering price, which represented the average of the quoted bid and asked prices for Gray Comm's shares on the over-the-counter market as of September 18, 1986. Willamette then discounted such offering price by 12.5 percent to take into account certain expenses such as underwriting fees, legal and accounting fees and other costs, concluding that the value per share would be $ 126.875. Willamette also examined what might be realized if decedent's shares were sold to a third party in a private offering. Ms. Walker testified that in determining what an unrelated third party would pay for decedent's shares, Willamette focused on the value of the entire company. Willamette valued Gray Comm primarily by capitalizing its media property income and also by considering the company's break-up value if all its businesses were sold. Willamette also considered that transfer of a controlling interest in Gray Comm to a third party would require the company to divest itself of either the Albany newspaper or the Albany television station under *359 the FCC's cross-ownership rule. Willamette capitalized only the revenues attributable to the company's broadcast and newspaper segments, stating that a distortion would occur if Gray Comm's total revenues were capitalized because the company's Video Systems subsidiary, while accounting for 39.6 percent of Gray Comm's total revenues, had only negligible operating profits. Willamette determined that Gray Comm's media properties, based on their revenues, had a value of about $ 73.3 million. Willamette then added the $ 9.3 million net book value of Gray's non-media subsidiaries (after adjustments for taxes), which indicated the entire company's value under an income capitalization approach to be about $ 82.6 million. Willamette assumed that Gray Comm's non-media subsidiaries could be sold for their net book value, less broker commissions, taxes, and other expenses. Willamette decided the value of the entire company would be about $ 81.8 million. However, because a transfer of a controlling interest in the company to other than the decedent's heirs would require that either the Albany Herald or the Albany television station, WALB-TV, be sold, Willamette adjusted its indicated value *360 of Gray Comm to $ 79 million to reflect the $ 2.8 million in taxes it believed would be payable on a sale of the newspaper. Willamette assumed that the new owner of decedent's shares would sell the Albany newspaper rather than the Albany television station since Gray Comm owned two additional television stations. Willamette concluded that the value per share, based on primarily capitalizing Gray Comm's media property earnings, would be $ 157.15. Willamette further analyzed what each of the company's subsidiaries could be sold for if Gray Comm were broken up. Willamette's report stated that television stations are typically sold based on a multiple of media cash flow (pretax operating income plus depreciation) and that multiples for broadcast stations range from 10 to 15 times media cash flow depending on the market, population, industrial growth, and a station's ranking and strength of its local news show. Willamette selected a media cash flow multiple of 13 for the Panama City, Florida, station because of the station's leading position in its market and the growth potential of that market. Willamette selected a multiple of 11 for the Albany television station, because of the *361 relatively flat growth outlook for its market. Willamette selected a multiple of 10 for the El Dorado/Monroe station because of its region's depressed economic conditions and the station's number two ranking in its market. The Willamette report stated that market values for newspapers are usually based on a multiple of their current revenues, that multiples normally range from 2 to 4 times the particular newspaper's revenues and that factors affecting selection of a price/revenue multiple for a newspaper are: its circulation, revenue, frequency of publication, competitive situation, location, and equipment. Considering such factors, Willamette applied a 2.5 revenue multiple to the Albany Herald's revenues as of June 30, 1986. Willamette also capitalized the Albany Herald's media cash flow. The Willamette report stated that newspaper media cash flow multiples range from 10 to 12. Willamette applied a multiple of 11 in capitalizing the Albany Herald's cash flow as of June 30, 1986. Willamette concluded that the remaining video system sales, transportation, and real estate development subsidiaries were operations that were cash drains on Gray Comm, and valued them at their net *362 book value. Ms. Walker testified that Willamette was told by Gray Comm's management that the real estate probably could not be sold for any price greater than what Gray Comm had paid for the real estate. Willamette concluded that Gray Comm's indicated break-up value was $ 95.8 million. [2] It further discounted this $ 95.8 million value by 15 percent to take into account the costs that would be incurred in selling the company's assets. Willamette, therefore, concluded that, in a break up of the company, Gray Comm's stock would have a value of $ 161.95 per share. After considering the three approaches discussed above, Willamette concluded that a rational seller would not sell decedent's shares in small lots over a 12.6-year period in compliance with SEC Rule 144. Willamette noted *363 that decedent's shares could be marketed for a higher price either in a public offering or in a private offering to a third party. It then stated that it would normally have given the greatest weight to marketing the shares in a private offering because the seller could realize the highest price per share. In the instant case, however, Willamette stated that attorneys for petitioner had indicated that litigation by Gray Comm's minority shareholders was likely if decedent's shares were marketed in a private offering. [3] As a result, Willamette gave less weight to the value that could be derived from marketing decedent's shares in a private offering. Willamette's opinion was that the most certain indication of value of decedent's shares would be based upon marketing the shares in a secondary public offering. It, therefore, valued decedent's shares at $ 140 per share. *364 Respondent's Experts
Respondent retained Business Valuation Services, Inc. (BVS) and Communications Resources, Inc. (CRS), to appraise decedent's shares as of September 19, 1986. Martin Hanan, who authored the BVS appraisal report, testified at trial. BVS concluded that the fair market value of decedent's shares was $ 51,318,000 or $ 202.20 per share. Ellen Gibbs, who authored the CRS report, testified at trial. CRS concluded that the fair market value of the shares was $ 198 per share. BVS and CRS noted that the market in 1986 for media properties was strong. In particular, the market for television stations was extremely active and very strong because television stations were generally perceived as highly desirable properties. Furthermore, in 1985, the FCC had increased the number of television stations that a single owner was permitted to own from 7 to 12. During the 18-month period prior to decedent's death, BVS noted that there was a record volume of transactions involving television stations. BVS and CRS valued decedent's shares utilizing a private offering approach. BVS and CRS were of the opinion that since the shares constituted a 50.487 percent majority *365 stock interest in Gray Comm, the shares should be marketed in a private offering to a third party. They stated that the shares should not be marketed through sales in small lots or in a public offering, because the seller would then not realize any control premium for decedent's controlling interest in Gray Comm above the public trading price or public offering price for Gray Comm shares. BVS and CRS concurred with petitioner's expert Willamette's assessment regarding the relative desirability of Gray Comm's three television stations. They concluded that the Panama City, Florida, station, WJHG-TV, was a very desirable station. Mr. Hanan stated that the station had great growth potential in light of the large increases expected in the State of Florida's population. Although the Albany, Georgia, station, WALB-TV, was very profitable and generated more current revenue than the Panama City station, they believed that the Albany station's market would remain stable. They thought that its market would not experience the future growth that was predicted for the Panama City station's market. BVS and CRS agreed that the Louisiana/Arkansas station, KTVE-TV, was the least attractive of *366 the three stations, because of the depressed economic conditions which existed in that station's market. Except for the Albany Herald newspaper, BVS and CRS generally determined Gray Comm's media subsidiaries to have values closely approximating the values determined by Willamette in its break-up analysis of Gray Comm. The following table compares the values BVS and CRS placed on each subsidiary with the value determined by Willamette: Valuation
Subsidiary
BVS
CRS
Willamette
WALB-TV
$ 39,030,376
$ 38,000,000
$ 39,000,000
WJHG-TV
14,050,556
12,000,000
14,100,000
KTVE-TV
5,975,810
6,000,000
6,000,000
Albany Herald
29,000,000
36,000,000
22,900,000
BVS agreed with Willamette that, to comply with the FCC's cross-ownership rule, a buyer of decedent's shares would have Gray Comm sell the Albany newspaper rather than the Albany television station, WALB-TV. BVS considered the Albany station to be a more desirable asset than the Albany newspaper. Unlike Willamette, however, BVS did not allow any discount for taxes that would be incurred by Gray Comm in selling the Albany Herald subsidiary. BVS indicated that if the sale of the newspaper subsidiary were consummated *367 by December 31, 1986, no tax liability on its sale might be incurred directly or indirectly by Gray Comm. Mr. Hanan stated that his understanding was that the 1986 Tax Reform Act's repeal of the General Utilities doctrine was generally effective only for acquisitions occurring after December 31, 1986. In arriving at its $ 29 million value for the newspaper, BVS, however, did allow a $ 1 million discount for selling costs that would be incurred by Gray Comm. BVS and Willamette generally valued the non-media subsidiaries and their properties at Gray Comm's net book value. BVS, however, valued the 1,103 acres of land owned by Gray Comm's real estate development subsidiary at $ 1.3 million, rather than at Gray Comm's book value of $ 1,184,254, because Gray Comm, during its fiscal year 1985, had paid $ 650,000 for a half interest in the land. BVS also made a reduction of $ 3,588,918 to take into account the non-media subsidiaries' estimated current liabilities. Accordingly, BVS concluded that the net value of Gray Comm's non-media assets was $ 12,644,958. BVS concluded that Gray Comm's net asset value per share, as of September 19, 1986, was $ 202.20. CRS concluded that Gray *368 Comm's net asset value per share was $ 203. Their respective computations of Gray Comm's net asset value per share are as follows: BVS
Asset
Value
Broadcast Properties * $ 60,000,000.00
Albany Herald
29,000,000.00
Others
12,644,968.00
Total
101,644,958.00
Net asset value per share 202.20
(502,700 shares outstanding)
* Includes addition of $ 973,095 that BVS estimated was the three television station's working capital.
CRS
Asset
Value Broadcast properties
$ 56,000,000.00 Albany Herald
36,000,000.00
Others
10,000,000.00
Total
102,000,000.00
Net asset value per share 203.00
(502,700 shares outstanding)
Valuation of Decedent's Shares
Decedent's shares represented a controlling, majority stock interest in Gray Comm. Although petitioner's expert acknowledged such controlling interest, Willamette concludes that most weight should be given to marketing the shares in a secondary public offering. In support of such conclusion, Ms. Walker testified at trial that a willing seller would forgo receiving a control premium for the shares, in exchange for "liquidity". She also testified that the existing threat of litigation *369 by Gray Comm's minority shareholders largely precluded marketing decedent's shares to a third party in a private offering. Petitioner's evidence of such threat of litigation by Gray Comm's minority shareholders, however, was thin. At trial, an attorney for petitioner testified that, in discussions with Mr. McKenna (the estate's executor) and Gray Comm's management, he had only generally advised that under Georgia law a majority shareholder owed a fiduciary duty to the corporation's minority shareholders. Mr. McKenna is an attorney and had been a partner in the law firm which had handled decedent and Gray Comm's legal affairs for many years. Although Mr. McKenna or other attorneys for petitioner or Gray Comm apparently could have testified about the threat of litigation, petitioner declined to offer their testimony. Consequently, the record only hints at such a possibility and does not establish that any definite threat of litigation existed. As to Willamette's selection of a secondary public offering as the best way to market decedent's shares in the instant case, we disagree. We do not believe that a willing seller would market the shares in a secondary public offering when *370 the shares could be sold for substantially more in a private offering. Accordingly, we conclude that a private offering to a third party is the proper market for valuing decedent's shares. See , affg. . We do, however, accept the premise of petitioner's expert that a buyer in a private offering would base the price it would pay for decedent's shares on an analysis of the value of Gray Comm's assets and businesses. As indicated above, the parties' experts do not vary significantly in their conclusions regarding the values for Gray Comm's assets, except for the Albany newspaper. We conclude that Gray Comm, as of September 19, 1986, had an underlying net asset value of $ 94,644,958 or $ 188.27 per share. We accept Willamette's values for the television station subsidiaries, which total $ 59.1 million and are fairly close to those of respondent's expert, BVS. We accept BVS's appraisal that Gray Comm's non-media assets had a net value of $ 12,644,958. BVS and Willamette generally valued the non-media assets at Gray Comm's book value for the assets, *371 except that BVS valued the 1,103 acres of land at $ 1.3 million. We find that BVS's valuation of the 1,103 acres is reasonable, considering that Gray Comm, during its fiscal year 1985, purchased a half interest in the land for $ 650,000. We further accept BVS's reduction of $ 3,588,918 to take into account estimated current liabilities. We do not allow a discount for selling costs. See . With regard to the Albany newspaper's value, BVS and Willamette agreed that if decedent's shares were sold in a private offering, the newspaper would subsequently be sold by Gray Comm because of the FCC's cross-ownership rule. Petitioner's expert, Willamette, valued the newspaper at $ 22.9 million, and respondent's expert, BVS, valued it at $ 29 million. Although BVS agrees that a $ 1 million discount for selling expenses is appropriate, it contends that no discount should be allowed for taxes. Willamette, in contrast, maintains that a $ 2.8 million discount should be allowed for selling expenses and taxes. Although we do not entirely accept Willamette's analysis, we conclude the newspaper had a value of $ 22.9 *372 million. In doing so, we note that Gray Comm, following a sale of decedent's shares in a private offering, would have to divest itself of the newspaper. BVS and Willamette were each of the opinion that the newspaper, rather than the Albany television station, would be sold to comply with the FCC's cross-ownership rule, and we accept that aspect of their opinions. As a sale of the newspaper under such circumstances would be a forced transaction, a potential buyer of the newspaper armed with such knowledge could drive a hard bargain. [4]
*373 As indicated above, we have concluded that Gray Comm, as of September 19, 1986, had an underlying net asset value of $ 188.27 per share. Although decedent's shares represented a controlling interest, the remaining 49.513 percent interest in Gray Comm owned by the minority stockholders represented a substantial minority interest. Accordingly, Gray Comm would have to be liquidated in order to realize its net asset value. One of respondent's experts claimed that a potential buyer for decedent's shares might wish to acquire all of Gray Comm's outstanding shares. Such buyer, the expert submitted, might even be willing to purchase the other 49.513 percent of Gray Comm's outstanding shares at a premium price, equal to the price per share it would pay for decedent's shares. In our view, however, a purchase of 100 percent of Gray Comm's shares would be a much larger and more complicated transaction than purchasing only decedent's shares. Moreover, some of the minority shareholders might not wish to sell their shares. Under such circumstances, we do not think that a willing buyer would purchase decedent's shares on the applicable valuation date for a price equal to Gray Comm's underlying *374 net asset value per share, as of September 19, 1986. Taking into account the substantial size of the minority interest and the potential for dissension and legal complications in the event of a liquidation for the purpose of realizing the net asset value of the company, we conclude that decedent's shares, as of September 19, 1986, had a fair market value of $ 178 per share. We believe the comments of the U.S. Court of Appeals for the Seventh Circuit in are appropriate in the instant case. The Seventh Circuit stated: The chief problem with * * * [the government's] argument is its assumption that the controlling seller, or a party to whom he sold his interest, could automatically liquidate the company to realize its asset value, unconstrained by the rigorous fiduciary duties which attach to possession of a controlling equity interest. While it is true that Indiana law permits a majority interest to effect a liquidation of a corporation, it is settled law that the power to cause such extraordinary corporate actions as dissolution or liquidation may not be exercised without scrupulous *375 loyalty to the interests of minority shareholders. Indeed, the fiduciary duty owed to the minority interest is even greater where, as here, the corporation is small, non-public and closely held. * * * [Citations omitted.]
See also to 79-1317, 79-1 USTC par. 13,290, at 87,080-87,082 (E.D. Wis. 1979). As in Estate of Curry, [5] we decline in the instant case to "impose a legal minimum on fair market value which slights practical legal realities." . [6]
*376 In reaching our conclusion, we also have considered the lawsuit filed by decedent's spouse in which she asserted a claim to one-third of decedent's shares. Because decedent's spouse had virtually no chance of prevailing on her claims, we conclude that the claim has little effect, if any, on the valuation of decedent's shares. We believe that her claim had only minimal nuisance value. The claim was based on an alleged oral promise by decedent to leave her one-third of his shares. Although petitioner and the other heirs under decedent's will concluded a settlement with her, the other heirs were apparently her own children and grandchildren. Petitioner's own expert also failed to take into account such litigation in valuing the shares. Petitioner offered no expert testimony concerning how such lawsuit and claim affected the valuation of decedent's shares. Moreover, petitioner offered no evidence concerning how its own attorneys had evaluated the prospects of success by decedent's spouse in the suit. Accordingly, we will ignore such claim in reaching our conclusion that the fair market value of decedent's shares as of September 19, 1986, was $ 178 per share. To reflect the foregoing *377 and certain adjustments agreed to by the parties, Decision will be entered under Rule 155.
Footnotes
1. Subsequent to trial, the parties agreed that 1,100 Gray Comm shares were publicly traded on the date of decedent's death, September 19, 1986. Included in the evidence of record is a May 6, 1987 report from the National Quotations Bureau, which reflects that 1,100 Gray Comm shares were traded on the over-the-counter market on September 19, 1986. Contrary to the experts' indications, there was public trading in Gray Comm's shares on the September 19, 1986, date of decedent's death. Respondent's expert is incorrect in noting in his report that there was no public trading in the shares on September 19, 1986.↩
*. Indicates high point for the date.↩
2. Willamette calculated Gray Comm's indicated break-up value as follows: ↩
Subsidiary Value WALB-TV
$ 39.0 million
WJHG-TV
14.1 million
KTVE-TV
6.0 million
Albany Herald
25.7 million
Others
11.0 million
Total
95.8 million
3. On cross-examination, Ms. Walker related that Willamette's discussions with petitioner's legal advisers was the sole basis for its belief that a threat of litigation by Gray Comm's minority shareholders existed. She stated that, based on the information petitioner's legal advisers provided about the minority stockholders' dissenting rights, Willamette believed that there was a high probability of litigation by the Gray Comm minority shareholders. Willamette, however, had not interviewed any of the minority shareholders. Ms. Walker further testified that Willamette did not determine a specific discount in the value of decedent's shares based on the risk of litigation, but considered such threat of litigation to be a factor which caused it to give greater weight to valuing the shares under the secondary public offering approach.↩
4. Although it was aware of the FCC rule's application, CRS claimed that the required subsequent divestiture of either the newspaper or the Albany television station would not affect the valuation of decedent's shares. CRS maintained that prior to purchasing the shares, the willing buyer could possibly attempt to secure a buyer for the newspaper or the station. We do not agree with such assumption. A sale of the newspaper might not be so easily arranged. Further, even if a potential buyer for the newspaper could be found beforehand, such a buyer would still be in a position to negotiate a favorable purchase price for the newspaper.↩
5. Although , involved Indiana law, Georgia law imposes similar fiduciary responsibilities on majority stockholders. See and cases cited thereat.↩
6. Although in our analysis above we discounted the existence of any actual threat of litigation in reaching our conclusion that the valuation of decedent's shares should be based upon a private offering rather than a secondary public offering, we do not find it inconsistent to consider such "practical legal realities" in reaching our conclusion that decedent's shares are worth approximately $ 10 per share less than underlying net asset value per share. The fiduciary responsibilities of a majority stockholder to the minority stockholders present significant legal complications which would need to be considered in a liquidation for the purpose of realizing net asset value. In contrast, such responsibilities would not preclude the sale of a majority owner's shares in a private offering. Accordingly, we think a slight discount is appropriate to take into account the potential for such problems.↩